

## NUMBER 13-05-371-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

ESTEBAN TREVINO VILLEGAS,                                         Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

## On appeal from the 92nd District Court of Hidalgo County, Texas.

## MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Vela
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Esteban Trevino Villegas, of capital murder of a child.

TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2003), § 19.03 (Vernon Supp. 2007).  The

trial court assessed an automatic life sentence.  *Id.* § 12.31(b). On appeal, appellant raises

eleven issues, which, for purposes of organization, will be reordered, addressed as five,

and referred to numerically as follows:  (1) the evidence was legally insufficient to support

a capital murder conviction; (2) the evidence was factually insufficient to support a capital murder conviction; (3) the trial court erred in denying appellant's motion for new trial based on newly discovered evidence and "in the interest of justice;" (4) the trial court abused its discretion in denying a new trial based upon the State's alleged withholding of material, exculpatory evidence; and (5) the State made inappropriate comments during closing arguments that improperly shifted the burden of proof to appellant, which constituted reversible error.  We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 12, 2003, appellant's ten-week-old son, Alexander Noah Villegas ("Alex") stopped breathing while he was in appellant's sole care.  Appellant reported that he had fed Alex at 11:00 a.m., Alex's usual meal time.  Subsequently, appellant put Alex down for a nap and then discovered that Alex had stopped breathing at about 1:00 p.m. Alex was rushed to McAllen Medical Center, where doctors discovered that he had a large skull fracture and intracranial bleeding that had caused massive brain swelling.  In addition, doctors found that Alex had twelve fractured ribs in various stages of healing, a fractured right arm bone, and fractures to both of his thigh bones.

Doctors conducted CT scans of Alex and found that he was brain dead. Furthermore, doctors reviewed the CT scans, other medical records, and appellant's statement that Alex was normal when he fed Alex at 11:00 a.m. and determined that the cause of Alex's injuries was child abuse, specifically shaken baby syndrome ("SBS") or shaken impact syndrome ("SIS").

In light of this information, appellant and his wife demanded a second opinion from Driscoll Children's Hospital ("Driscoll") in Corpus Christi.  Doctors at Driscoll came to the

same conclusion that Alex had been abused and that the abuse was the cause of his injuries. On November 15, 2003, Alex was pronounced dead. The Nueces County medical examiner concluded that Alex's cause of death was homicide by SBS or SIS.

On March 4, 2004, appellant was charged by indictment with one count of capital murder stemming from the death of his infant son, Alex. TEX. PENAL CODE ANN. § 19.02(b)(1), § 19.03(a)(8). On October 4, 2004, appellant filed a "MOTION TO PRODUCE EXCULPATORY AND MITIGATING EVIDENCE" pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Subsequently, appellant pleaded not guilty to the crime alleged and proceeded to trial by jury in the 92nd District Court of Hidalgo County.

Trial commenced on January 17, 2005. At trial, the State's evidence demonstrated that Alex was normal and healthy until appellant was forced to miss his college classes for a fourth day in a row to babysit Alex on November 12, 2003. The State presented expert testimony from Alex's pediatrician—Jorge Kutagata, M.D., the obstetrician who delivered Alex—Mitchell Hughston, M.D., two pediatric intensive care physicians—Krishna Turlipati, M.D. and Karl Serrao, M.D., a pediatric resident—Beth Treviño, M.D., a pediatric neurologist—Wilson Sy, M.D., and the Nueces County medical examiner—Ray Fernandez, M.D., demonstrating that Alex's injuries could have only been caused by vigorous shaking and blunt force trauma to his head when left alone with appellant. Appellant presented two expert witnesses, his wife's current obstetrician/gynecologist—Ruben Martinez, M.D.—and an internist—Jerry Bush, M.D. Appellant also presented the testimony of Alex's mother, Ana Moya. All of appellant's witnesses testified that Alex's injuries were due to "acute infantile scurvy" or vitamin C deficiency.

The jury found appellant guilty of capital murder; however, the State did not seek

3

the death penalty. On February 9, 2005, appellant received the automatic sentence of life imprisonment. Subsequently, on March 10, 2005, appellant filed a motion for new trial with the trial court based upon newly discovered evidence regarding Dr. Cesar Costa-Luna's expert opinion that the date of occurrence of Alex's linear skull fracture cannot be determined unless a microscopic slide examination is performed. Appellant's motion also complained of the failure of the State to disclose exculpatory evidence pertaining to statements made by Anastasio Farias, an employee of Pro Medic EMS and a prosecution witness, that were allegedly favorable to appellant.

On March 11, 2005, appellant filed an amended motion for new trial reasserting the contentions he raised in his original motion for new trial and alleging that the jury's verdict does not comply with rule 21.3(c) of the Texas Rules of Appellate Procedure.[1] *See* TEX. R. APP. P. 21.3(c) (requiring the trial court to grant a defendant a new trial "when the verdict has been decided by lot or in any manner other than a fair expression of the juror's opinion"). On April 21, 2005, the State filed a motion to strike the juror affidavits appellant relied upon in his amended motion for new trial. The trial court subsequently granted the State's motion to strike.[2] After a hearing, the trial court denied appellant's original and

---

[1] Appellant presented the affidavits of Thelma Quintanilla and Eduardo Perez to establish his contention that the jury verdict was unreliable. *See* TEX. R. APP. P. 21.3(c). The affidavit from juror Quintanilla stated that she felt pressured by other jurors to change her vote to guilty and that it is likely that two other jurors who originally were undecided were pressured to change their votes to guilty. Appellant asserts that Quintanilla's guilty vote is not a fair expression of her opinion. Appellant also asserted that the affidavit of Eduardo Perez established that the jury relied upon the unreliable testimony of the State's expert witnesses as it pertained to identity and the date of Alex's skull fractures. Appellant therefore contends that Perez's affidavit also establishes that the jury's verdict is unreliable. *See id.*

[2] There is neither a date included in the trial court's order granting the State's motion to strike appellant's juror affidavits nor a file stamp by the trial court; however, the order is signed by the trial judge and has been made part of the record.

4

amended motions for new trial on April 25, 2005.[3]  This appeal ensued.

## II. ANALYSIS

## 1. Legal Sufficiency of Appellant's Capital Murder Conviction

By his first issue, appellant contends that the evidence supporting his capital murder conviction is neither legally nor factually sufficient.  In support of this contention, appellant argues that:  (1) the fact that the evidence tended to show that appellant was the last person to be seen with the child is insufficient to sustain the conviction and (2) newly discovered expert, Dr. Costa-Luna, opined that the fracture Alex sustained could not be dated without a microscopic examination, and testimony from other physicians regarding the fracture is mere speculation and therefore unreliable.  Conversely, the State contends that:  (1) appellant has provided "numerous highly improbable explanations of his son's injuries;" (2) appellant waived any objection to the reliability of the State's expert witnesses; and (3) the State was not required to perform any particular scientific test to properly establish causation.

### a. Standard of Review

In a legal sufficiency review, we view the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Watson v. State*, 204 S.W.3d 404, 414-17 (Tex. Crim. App. 2006).  The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given

---

[3] Specifically, in denying appellant's amended motion for new trial, the trial court noted that "the Court is of the opinion that the evidence is legally sufficient to support the verdict.  The Court declines to acquit ESTEBAN VILLEGAS."

5

to testimony.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-39; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).  We do not reevaluate the weight and credibility of the evidence, whether circumstantial or direct, nor do we substitute our own judgment for that of the trier of fact. *Mosley v. State*, 141 S.W.3d 816, 821 (Tex. App.–Texarkana 2004, pet. ref'd); *Beckham*, 29 S.W.3d at 151. Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151.

In legal sufficiency review, each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.  *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex. Crim. App. 1994); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex. Crim. App. 1987)).  Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor; circumstantial evidence alone can be sufficient to establish guilt.  *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).  On appeal, both circumstantial and direct evidence cases are examined using the same standard of review.  *Id.*

We measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge.  *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "Such a charge would accurately set out the law, would be authorized by the indictment, and would not unnecessarily increase the State's burden of proof."  *Malik*, 953

S.W.2d at 240. The elements of the charged offense in this case are: (1) appellant intentionally or knowingly caused the death of an individual; and (2) the individual was under six years of age. *See* TEX. PENAL CODE ANN. § 19.02(b)(1), § 19.03(a)(8). A successful legal sufficiency challenge will result in the rendition of an acquittal by the reviewing court. *Adi*, 94 S.W.3d at 128 (citing *Tibbs v. Florida*, 457 U.S. 31, 41-42 (1982)).

### b. Discussion

In his first sub-issue, appellant argues that the State's evidence was legally insufficient as to identity. In support of his contention, appellant cites to a litany of cases and compares the strength of evidence and the outcomes in those cases with the evidence presented at trial and offers alternative explanations for Alex's cause of death.[4]

---

[4] Specifically, appellant notes that: (1) "[t]here was nothing in [this case] like *Nathan's* [*Nathan v. State*, 611 S.W.2d 69 (Tex. Crim. App. 1981)] saying he had gotten rid of a person"; (2) unlike *Skelton v. State*, 795 S.W.2d 162 (Tex. Crim. App. 1990), "[t]here is no evidence here that the father threatened his own child"; (3) unlike *Powell v. State*, 822 S.W.2d 231 (Tex. App.–El Paso 1991, no pet.), "[t]here was no statement by the defendant that he had striken [sic] the child"; (4) "[t]here was no evidence . . . of a note asking for forgiveness . . . [appellant] did not say that he struck the child. Nor was there any physical evidence in [this case] like the similar knots in *Camacho*," *see Camacho v. State*, 765 S.W.2d 431 (Tex. Crim. App. 1989); (5) "In [this case] the evidence shows that the father was the last person seen with the child. The evidence is no stronger in [this case] than it was in *King*," *see King v. State*, 638 S.W.2d 903 (Tex. Crim. App. 1982); and (6) "In [this case] there is no improbable explanation by [appellant]. The State had a stronger case in *Wright* than it does in [this case]. But Wright was acquitted, on stronger evidence than that presented against [appellant]," *see Wright v. State*, 603 S.W.2d 838 (Tex. Crim. App. 1980).

It is clear to this Court that the court of criminal appeals determined the above cited cases upon which appellant relies using the old legal sufficiency standard which required the State to exclude all other reasonable hypotheses. *See, e.g., King*, 638 S.W.2d at 904 ("A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the guilt of the defendant; proof amounting only to a strong suspicion or mere probability is insufficient."); *Nathan*, 611 S.W.2d at 75 (same); *Skelton*, 795 S.W.2d at 167-69 (same); *Powell*, 822 S.W.2d at 234 (same); *Wright*, 603 S.W.2d at 840 (same). The court of criminal appeals, in *Geesa v. State*, overruled the "reasonable hypothesis" construct for legal sufficiency review. 820 S.W.2d 154, 156-161 ("[T]here is but one standard of proof for criminal convictions and where the jury is properly instructed on that standard, a charge on circumstantial evidence is valueless and invites confusion. . . . Rather than aiding jurors in applying the reasonable doubt standard, an additional charge on circumstantial evidence focusing on the "reasonable hypothesis" theory serves only to distract jurors from examining the proper standard of proof as the primary focus of their deliberations.").

Appellant further notes that the dissent in *Geesa* demonstrated how the "Court of Criminal Appeals has used both the *Jackson* standard and the "exclude every other reasonable hypothesis" construct to reach

7

Appellant testified at trial and noted on several occasions that Alex was fine at 11:00 a.m. It is undisputed that Alex was unconscious and not breathing at 1:00 p.m. the same day. The evidence demonstrated that appellant was the only person with Alex from the time period of 11:00 a.m. to 1:00 p.m. on November 12, 2003. Since Alex's death, appellant has claimed he did not hurt Alex and offered a myriad of explanations for Alex's injuries: that four nurses pushed on his wife's stomach during Alex's birth; that his wife was denied a C-section; that his wife's friend had a baby who had stopped breathing in the care of the same obstetrician; and that his wife was told that she could not have children because "they would not live." Then, at trial, appellant contended that Alex, who weighed over 11 pounds at ten weeks of age and who was fed vitamin-C-enriched infant formula, had a vitamin C deficiency that caused him to sustain a fatal massive skull fracture and brain bleeding, as well as fifteen different bone fractures.[5] At no time did appellant claim that another person was present and could have caused the injuries Alex sustained or that he was not entrusted with babysitting Alex on November 12, 2003. The jury, being the sole judge of credibility of the witnesses, was free to accept or reject the evidence before it, and in doing so, concluded that it was appellant who intentionally murdered Alex. *See Trevino*

---

the same result." 820 S.W.2d at 169 n.8 (Clinton, J., dissenting). Appellant then argues that either test would yield the same result: that the evidence was legally insufficient. However, we find the dissent in *Geesa* to be unpersuasive in light of the Court of Criminal Appeals' more recent determination that reviewing courts are to examine circumstantial and direct evidence cases using the same legal sufficiency standard: the *Jackson* standard. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

[5] Dr. Beth Treviño testified that appellant provided numerous "blame alternatives" and tried to minimize the severity of Alex's fractured bones by stating "they're already healing." Dr. Treviño also noted that appellant showed little concern for how Alex got the fractures in the first place. Christine Ketchum, a social worker at Driscoll who interviewed appellant, Alex, and Ana Moya, Alex's mother, testified that Moya admitted that she was unsure what happened the day Alex died. In addition, Ketchum noted that "[p]atient appears to have been physically assaulted as per the injury patient shows as highly suspicious of child abuse. The family appears to give no explanation of how patient came to injuries." Ketchum further testified that Alex exhibited signs of past abuse, which neither Moya nor appellant could explain.

*v. State*, 228 S.W.3d 729, 738 (Tex. App.–Corpus Christi 2006, pet. ref'd) (citing *Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1985)). Considering appellant was the only person with Alex during the relevant time period, we conclude that the evidence is legally sufficient as to the issue of identity. *See Earls*, 707 S.W.2d at 85 ("Evidence as to the identity of the perpetrator of an offense can be proved by direct or circumstantial evidence."). We further conclude that it was not incumbent upon the State to exclude all other reasonable hypotheses. *See Guevara*, 152 S.W.3d at 49 (applying the same standard of review for direct and circumstantial evidence cases).

In his second sub-issue, appellant contends that the testimony from the State's expert witnesses regarding the dating of Alex's skull fracture is mere speculation and therefore unreliable in light of Dr. Costa-Luna's affidavit testimony. Specifically, appellant notes that "[t]he testimony of Doctors Turlipati, Serrao, Sy, and Fernandez amounts to mere speculation about the date and time of the [skull] fracture, since none of them did a microscopic examination of the fracture and none of them did a microscopic examination of the skull." Appellant also argues that the State's evidence was "scientifically unreliable." We construe this sub-issue as a challenge to the legal sufficiency of the State's evidence on causation.

The admission of expert testimony lies within the sound discretion of the trial court and will not be set aside absent a showing of an abuse of that discretion. *Joiner v. State*, 825 S.W.2d 701, 708 (Tex. Crim. App. 1992). Rule 702 of the Texas Rules of Evidence governs the admission of all expert testimony. *See* Tex. R. Evid. 702; *see also Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992). Rule 702 provides:

9

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702.

The trial court, before admitting expert testimony, must be satisfied that three conditions are met:  (1) that the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is an appropriate one for expert testimony; and (3) that admitting the expert testimony will actually assist the fact-finder in deciding the case.  *Alvarado v. State*, 912 S.W.2d 199, 215-16 (Tex. Crim. App. 1995).  However, the "threshold determination" for a trial court to make regarding the admission of expert testimony is whether the testimony will help the jury understand the evidence or determine a fact in issue.  *See Kelly*, 824 S.W.2d at 572. "Unreliable . . . scientific evidence simply will not assist the [jury] to understand the evidence or accurately determine a fact in issue; such evidence obfuscates rather than leads to an intelligent evaluation of the facts."  *Id.* (quoting K. Kreiling, *Scientific Evidence: Toward Providing the Lay Trier With the Comprehensible and Reliable Evidence Necessary to Meet the Goals of the Rules of Evidence*, 32 ARIZ. L. REV. 915, 941-42 (1990)).[6]

---

[6] In *Kelly v. State*, the court of criminal appeals noted:

Factors that could affect a trial court's determination of reliability include, but are not limited to, the following:  (1) the extent to which the underlying scientific theory and technique are accepted as valid by the relevant scientific community, if such a community can be ascertained; (2) the qualifications of the experts testifying; (3) the existence of literature supporting or rejecting the underlying scientific theory and technique; (4) the potential rate of error of the technique; (5) the availability of other experts to test and evaluate the technique; (6) the clarity with which the underlying scientific theory and technique can be explained to the court; and (7) the experience and skill of the person(s) who applied the technique on the occasion in question.

However, in the instant case, appellant's unreliability argument is entirely premised on his assertion that the State's medical experts did not conduct a microscopic examination of Alex's skull and of the fracture itself. To the contrary, the record contains findings filed by Dr. Fernandez which indicate that a microscopic examination of Alex's skull and Alex's skull fracture was conducted on November 17, 2003. Dr. Fernandez noted the following with respect to the microscopic examination of Alex's skull and skull fracture: "[e]xtravasated fresh blood." In an affidavit filed April 19, 2005, Dr. Fernandez stated: "The skeletal trauma of the skull fracture was examined by x-rays, gross autopsy and by microscopic exam. The skull fracture is recent and minutes to hours old." Therefore, it is clear from the evidence adduced at trial that a microscopic examination of Alex's skull and skull fracture was conducted. Based in part on Dr. Fernandez's findings from the microscopic examination of Alex's skull and skull fracture, the jury was free to conclude that appellant, being the only person with Alex during the relevant time period, caused the injuries Alex sustained.

On appeal, appellant has not attacked the method by which Dr. Fernandez conducted the microscopic examination nor argued to the trial court that alternative methods for conducting microscopic examinations exist or that an additional microscopic examination would yield a different result. Instead, appellant steadfastly contends that no microscopic examination was conducted and that because of this, the testimony of the State's medical experts as to the date of the skull fracture was mere speculation and

824 S.W.2d 568, 573 (Tex. Crim. App. 1992).

11

therefore unreliable expert testimony.[7]   Because the record reflects that a microscopic examination was conducted, Dr. Fernandez's findings helped establish the date of the injury, and appellant did not dispute the method by which Dr. Fernandez conducted the microscopic examination, we conclude that the evidence is legally sufficient as to the issue of causation.[8]

Because we have concluded that (1) the evidence was legally sufficient as to identity and the State was not required to exclude all reasonable hypotheses and (2) the evidence is legally sufficient as to the issue of causation, we overrule appellant's first issue.

**2. Factual Sufficiency**

In his second issue, appellant asserts that the evidence is factually insufficient to sustain his conviction.  Specifically, appellant notes "[i]n [this case] the evidence is factually insufficient because the testimony of Doctors Turlipati, Sy, Fernandez, and Serrao is unscientific for failure to follow professional norms . . . .  It is overcome by the testimony of Drs. Bush and Costa-Luna and the professional literature and the complete failure of the [S]tate to prove any motive for a father to kill his own son."  Conversely, the State contends that (1) it was not required to prove motive, (2) appellant's own expert witness testified that

---

[7] On appeal, appellant appears to argue that the State's expert witnesses did not adhere to professional norms in deriving their findings and subsequent testimony.  However, appellant has not provided this Court with an explanation as to how the State's expert witness did not adhere to professional norms.  As such, we find that this contention has been inadequately briefed. *See* TEX. R. APP. P. 38.1(h).

[8] Although it appears to be good practice to conduct a microscopic examination to date bone fractures, appellant has not cited to nor are we aware of any authority that requires the State to conduct a microscopic examination, much less any other tests, to date a bone fracture during the course of a criminal investigation.  Moreover, appellant has not provided expert testimony disputing the methods used by Dr. Fernandez in conducting the microscopic examination or his subsequent findings.  Appellant merely argues on appeal that a microscopic examination was not conducted and that Dr. Costa-Luna's testimony proves that a skull fracture cannot be "accurately timed or dated without microscopic examination of both the fracture and the skull."

12

Alex's injuries could not have been sustained during birth, (3) the jury is permitted to make reasonable inferences and to "stack" inferences, and (4) despite some conflicting evidence in the record, the jury's verdict is not against the "great weight and preponderance of the evidence."

## a. Standard of Review

In a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust. *Watson*, 204 S.W.3d at 414-15. After considering all of the evidence in the record related to appellant's sufficiency challenge, we compare the evidence weighed by the jury that tends to prove the elemental fact in dispute with the evidence that tends to disprove it. *Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997) (en banc). This Court will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Watson*, 204 S.W.3d at 415.

## b. Discussion

We begin this section by addressing appellant's contention that the evidence was factually insufficient to support his conviction because the State failed to prove motive beyond a reasonable doubt. However, the court of criminal appeals has held that proof of motive is not required to sustain a conviction for capital murder. *See Vuong v. State*, 830 S.W.2d 929, 934 (Tex. Crim. App. 1992) ("Finally, we note that it is not required that the State show a motive in order to sustain a conviction of capital murder.") (citing *Garcia v. State*, 495 S.W.2d 257, 259 (Tex. Crim. App. 1973)). Therefore, appellant's contention

13

that the State failed to prove motive beyond a reasonable doubt does not render the evidence factually insufficient to sustain his conviction.

Appellant also argues that the State's "proof is stacked inferences and unreasonable inferences: 'The dad was the last one seen with the child, the child had some fractures that could have been from birth trauma or could have been from vitamin deficiency, the bleeding could have been from the vitamin deficiency, but the mom and dad were apart and perhaps estranged, so the dad must have killed the baby.'"[9]

We will first address appellant's contention that the jury impermissibly "stacked inferences." The court of criminal appeals has recently opined on the issue of "stacked inferences," but in the context of legal sufficiency review. In *Hooper v. State*, the court noted that:

> In the context of modern criminal law, a rule against inference stacking is unnecessary. . . . [W]e permit juries to draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. However, juries are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. . . . A presumption is a legal reference that a fact exists if the facts giving rise to the presumption are proven beyond a reasonable doubt. . . . A jury may find that the element of the offense sought to be presumed exists, but it is not bound to find so. In contrast, an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented. A conclusion reached by speculation may not be completely unreasonable, but it is not sufficiently based on facts or evidence to support a finding beyond a reasonable doubt.
> As stated above, juries are permitted to draw multiple reasonable

---

[9] In closing arguments, appellant first speculated about appellant and Moya being apart or perhaps estranged and that stress resulted in appellant's frustration. Specifically, appellant's trial counsel argued "I guess Mr. Almaguer, through his examination of Ms. Moya in asking her about not being able to sleep with Ms. Moya [sic] [appellant] at night is an indication of some kind of a sexual frustration. I don't know what he was driving at." Regardless, as later explained, the remaining evidence contained in the record is factually sufficient to support appellant's conviction.

14

inferences from the evidence (direct or circumstantial), but they are not permitted to draw conclusions based on speculation.

214 S.W.3d 9, 15-16 (Tex. Crim. App. 2007) (citations omitted). Based on our review of Texas case law, the court of criminal appeals has not applied the *Hooper* reasoning pertaining to "stacked inferences" to factual sufficiency review. However, we need not "stack" inferences in the instant case to conclude that the evidence is factually sufficient to support the jury's verdict.

### i. Appellant's Witnesses

The record contains testimony from appellant's own expert witness, Dr. Martinez, that Alex's injuries were not caused by a difficult delivery. Specifically, Dr. Martinez noted:

Q:     Doctor, if you would—did you see the records of—the delivery records?

A:     Yes, I reviewed them front to back.

Q:     Okay. Did you see the records of Baby Alex?

A:     The baby was born perfectly fine. He had excellent Apgars. His pH, that is when we measure acidity in the blood in [sic] the newborn, was normal. The baby had—it was a difficult delivery, but the baby came out fine.

       . . . .

Q:     So we can eliminate birth trauma?

A:     Absolutely, and I eliminated it.

The State's expert witnesses agreed with Dr. Martinez's assessment that Alex did not

sustain injuries during delivery.[10] Dr. Martinez further noted that he believed Alex died from acute neonatal vitamin C deficiency secondary to vaccination.[11]

Dr. Bush testified that Alex's injuries were probably caused by a vitamin C deficiency. However, Dr. Bush admitted that he had only been involved with one shaken baby syndrome case during his rotations in the mid-1980's and testified that a vitamin C deficiency does not result in a skull fracture. Dr. Bush also recognized that although he believes that Alex's injuries were caused by a vitamin C deficiency, there could be "other possibilities" as to the cause of those injuries. In addition, Dr. Bush testified that it takes six to twenty-four months for chronic infantile scurvy (Barlow's disease) to develop even though Alex was only ten weeks old at the time of his death. On the other hand, Dr. Bush noted that acute infantile scurvy can occur in infants much younger than six months.[12] Dr. Bush further testified that the bones of children diagnosed with vitamin C deficiency are thin. Dr. Bush admitted that he did not personally examine the bones of Alex to determine if Alex's bones were thin.

Moya, appellant's wife, also testified on behalf of appellant. Moya noted that Alex did not like the Infamil formula that he was being fed and that he was fussy and colicky about 50% to 75% of the time. Moya offered numerous explanations and excuses for Alex's injuries, including a difficult delivery where four nurses pushed on her stomach and

---

[10] Dr. Mitchell Hughston, the obstetrician who delivered Alex, also concluded that Alex was healthy at birth and that there were no injuries to Alex's head at the time of birth.

[11] The record does not contain any scientific literature or evidence supporting Dr. Martinez's theories on Alex's death. Dr. Martinez admitted at trial that his theory was based on his own notes, which were not admitted into evidence.

[12] Dr. Bush notes that infantile scurvy is also known as Barlow's disease and that "acute infantile scurvy" merely refers to the sudden onset of infantile scurvy.

Dr. Hughston denied her a C-section, Dr. Kutagata allegedly lied about appellant stating that Alex suffered a bruised eye because he hit his head on the table, Alex had problems since birth that Dr. Kutagata did not document, Dr. Kutagata allegedly did not do his job well, and Dr. Serrao did not do all the tests she requested. Moya further testified that appellant attended college classes on Mondays, Wednesdays, and Fridays and for two hours on Tuesdays and Thursdays. Moya noted that her mother usually watched Alex while appellant was in school and she was at work.[13]

### ii. The State's Witnesses

Dr. Fernandez testified that Alex's bones were not thin and were not vitamin C deficient based upon the results of his autopsy of Alex's body. Dr. Fernandez also testified that Alex weighed ten pounds at the time of the autopsy, which represented an increase in Alex's weight from 6.6 pounds when Dr. Serrao examined Alex at Driscoll. Dr. Kutagata, Alex's pediatrician, testified that the symptoms of juvenile scurvy are bleeding, swelling, a purplish color, fragility, pain mainly in the legs, lack of healing, and lesions and fractures; mainly in the long bones and wrists, but skull fractures are rarely seen. Dr. Kutagata also testified that very few American children have Barlow's disease because most infant formulas contain vitamin C. Dr. Kutagata further testified that vaccines do not cause vitamin C deficiency and that Alex's injuries are not consistent with vitamin C deficiency because vitamin C is needed for healing and Alex had many rib fractures in different stages of healing. Dr. Kutagata noted that Alex was not vitamin K deficient because he

---

[13] Moya testified that she worked from 6:30 a.m. to about 6:00 p.m. The record also contains the testimony of Maria Elena Moya, Ana's mother and Alex's grandmother, who testified that she was unable to care for Alex on November 12, 2003, because she had been ill with the flu for several days and that appellant asked for permission to care for Alex on those days.

17

received a vitamin K shot just after birth and had not bled profusely when he was circumcised. Finally, Dr. Kutagata recalled an instance on November 4, 2003, when Alex's grandparents brought Alex in complaining that he was fussy, irritable, had a runny nose, a loss of appetite, and was vomiting. Dr. Kutagata noticed a thin bruise under Alex's left eye and asked how it happened. Dr. Kutagata testified that Alex's grandmother replied that she did not know how it happened but "it's not what you're thinking." Appellant called later to explain that Alex had "bobbed" and hit his eye on the table.

Dr. Treviño testified that she had interviewed appellant and that he disclosed to her that Alex fed well and was on Infamil formula, which contained all the necessary vitamins, including vitamin C. Dr. Treviño's testimony revealed that "[t]he recommended daily allowance for vitamin C in infants zero to six months is anywhere from the 38 to 48 milligrams per day. And this child was receiving the proper amount of vitamin C daily." Dr. Treviño noted earlier that Alex was being fed two to three ounces of Infamil every three hours and Infamil has "2.4 milligrams of vitamin C per ounce."

Dr. Turlipati, the pediatric intensive care doctor who treated Alex at McAllen Medical Center, testified that he also interviewed appellant who disclosed to him that Alex was feeding well about two hours prior to his death. Dr. Turlipati also testified as to SBS/SIS. Dr. Turlipati noted that there was bleeding that was very recent around the skull fracture Alex sustained. He also testified that Alex exhibited numerous other physical indications of SBS/SIS, including blood along the tentorium of the cerebellum and the interhemispheric fissure, a subdural hematoma, and flame-shaped retinal hemorrhages. Based on his experience, Dr. Turlipati testified that SBS/SIS usually occurs when a care giver becomes

18

frustrated with a baby who will not stop crying.[14]  Dr. Turlipati also commented on Alex's rib fractures, noting that some of the fractures were at least two weeks old, which indicated to him that Alex had been abused in the past.  Dr. Turlipati testified that someone had squeezed Alex and fractured his ribs, which would have caused him to be cranky, to vomit, and to have bowel movement problems because he was in pain.  Dr. Turlipati also testified that Alex was fed baby formula and that vitamin C deficiency was not the cause of Alex's injuries.  Finally, Dr. Turlipati stressed the importance of the child's history in establishing child abuse.  Dr. Turlipati noted that the family never made a report of an accidental fall and the family had no explanation for Alex's injuries at the time he examined Alex.

Dr. Sy, the pediatric neurologist who also treated Alex at McAllen Medical Center testified that he conducted tests on Alex when he was in a deep coma and very close to brain dead.  Dr. Sy testified that Alex's injuries were very severe and required "a lot of force, a lot of shaking."  Dr. Sy noted that the bleeding in Alex's brain was consistent with SBS/SIS and that child abuse was very high on his list of possibilities.

Dr. Serrao, the pediatric intensive care doctor who treated Alex at Driscoll, testified that based on his examination of Alex, it was clear to him that Alex's head hit a blunt object like a wall or mattress.  Dr. Serrao further testified that Alex suffered a closed head injury due to non-accidental trauma.  Dr. Serrao concluded that Alex died of SBS/SIS and the shaking occurred on November 12th.  Finally, Dr. Serrao noted that Alex's fractures could not have been caused by his delivery, CPR, someone running with him, or a vitamin C

---

[14] It is this testimony upon which the State based its theory regarding Alex's death:  appellant became frustrated that Alex continually cried and that he had to miss his college classes for a fourth day in a row; therefore, appellant shook Alex and threw him back into his crib.

19

deficiency; he was murdered.

Based on the foregoing, we conclude that no "stacked inferences" were necessary to support appellant's conviction. It was undisputed at trial that appellant was the sole care giver of Alex during the relevant time. Furthermore, the evidence demonstrates that Alex's injuries were not from birth trauma and most likely not the result of a vitamin C or K deficiency. In fact, Dr. Kutagata, Dr. Turlipati, Dr. Serrao, Dr. Sy, and Dr. Fernandez all testified that Alex's injuries were not caused by a vitamin C deficiency, but by intentional child abuse. It is clear from our review of the record that the jury was reasonable in concluding that Alex's injuries were the result of SBS/SIS, especially in light of the State's expert witnesses. *See Watson*, 204 S.W.3d at 414-15 (noting that we only reverse a jury's verdict if the verdict is manifestly unjust or clearly wrong). Therefore, the jury needed only to infer that appellant must have killed Alex given the fact that he was the sole care giver of Alex during the relevant time period and that Alex's injuries were most likely caused by SBS/SIS while appellant served as Alex's sole care giver. As such, only one inference was needed. We further conclude that the evidence adduced at trial was factually sufficient to support the jury's verdict. Accordingly, we overrule appellant's second issue.

**3. Motion for New Trial Based on Newly Discovered Evidence and "In the Interest of Justice"**

In his third issue, appellant asserts that he is entitled to a new trial because he has discovered Dr. Costa-Luna who will testify that the date of occurrence of the linear fracture on Alex's skull cannot be determined unless a microscopic slide examination is performed. Appellant further asserts that no microscopic slide examination was conducted and that

20

the State's expert witnesses merely speculated on the date of the occurrence of the skull fracture, which resulted in an unreliable jury verdict. Appellant also contends that certain jurors were pressured by other jurors to return a guilty verdict, thus also resulting in an unreliable jury verdict. The State counters by arguing that appellant has not presented an issue for appeal with respect to this issue. The State further argues that Dr. Costa-Luna's testimony was adduced at the motion for new trial hearing and that his testimony is merely collateral of impeaching evidence and would not yield a different result in another trial. With respect to appellant's contention that the trial court should have granted his motion for new trial "in the interest of justice," the State contends that the issue has not been preserved for appeal and that appellant has failed to demonstrate that the jury's verdict was unreliable.

### a. Applicable Law

Article 40.001 of the Texas Code of Criminal Procedure provides "[a] new trial shall be granted an accused where material evidence favorable to the accused has been discovered since trial." TEX. CODE CRIM. PROC. ANN. art. 40.001 (Vernon 2006). However, a trial court has discretion to decide whether to grant a new trial based upon newly discovered evidence, and its ruling will not be reversed absent an abuse of discretion. *See Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). A party seeking a new trial on the ground of newly discovered evidence must show (1) the newly discovered evidence was unknown or unavailable to the movant at the time of his

trial, (2) the movant's failure to discover or obtain the evidence was not due to a lack of diligence, (3) the new evidence is admissible and is not merely cumulative, corroborative, collateral, or impeaching, and (4) the new evidence is probably true and will probably bring about a different result on another trial. *Keeter,* 74 S.W.3d at 36-37.

### b. Discussion

In his original and amended motions for new trial, appellant included an affidavit of Dr. Costa-Luna detailing his opinions on the medical testimony and analysis provided by Drs. Turlipati, Serrao, Sy, and Fernandez. In his affidavit, Dr. Costa-Luna provides:

> In this case, no tests were conducted by any of the doctors to date the skull fracture from a few minutes to two hours.

> I have been involved in many cases involving child abuse, allegations of shaken baby and shaken impact syndrome, and cases involving linear skull fractures. Without detailed medical microscopic examinations of the fracture and the skull it is not possible with reasonable medical probability to date a linear skull fracture. To date the linear skull fracture without the microscopic examination of the fracture and the skull by the pathologist would involve nothing more than speculation as to when the fracture occurred.

> In a case like the one involving Baby Alex Villegas, the only way to accurately date the linear skull fracture is to exhume the body and have a pathologist use microscopic slides of the fractured skull to be able to date the linear skull fracture.

In his amended motion for new trial, appellant states that "[he] used due diligence in preparing for this trial but was unable to discover the existence of this expert." Appellant also contended that "[t]he materiality of this evidence is such as would probably bring about a different result in another trial" and that "[s]uch evidence is admissible and not cumulative, corroborative, collateral, or impeaching."

22

However, in its response to appellant's amended motion for new trial, the State reintroduced the investigative report and autopsy findings filed by Dr. Fernandez demonstrating that a microscopic examination was conducted on Alex's skull fracture. In his report, Dr. Fernandez made the following notes: "[e]xtravasted fresh blood." Dr. Fernandez also conducted microscopic examinations of Alex's brain, bones, lungs, and gastrointestinal tract. The State also provided an affidavit from Dr. Fernandez that stated the following:

> It is my opinion that Alexander N. Villegas died from Shaken Impact Syndrome. The conclusion is based on the Medical [sic] records and autopsy findings.

> The skeletal trauma of the skull fracture was examined by x-rays, gross autopsy and by microscopic exam. The skull fracture is recent and minutes to hours old.

The record also contains Dr. Turlipati's testimony in which he notes the following:

Q:    This skull fracture, is it an old skull fracture or a new—a fresh one?

A:    It had to have occurred—if I'm just looking at the skull fracture and nothing—not involving other findings in the scan, it could be a week or two.

Q:    Now, when you look at all the findings—

A:    It's recent.

Q:    And how recent?

A:    It could have been within hours to a day.

Q:    Within one hour?

A:    Yes.

23

Q:      Or a what?

A:      Or a day.

Additionally, the State directs us to the following testimony of Dr. Serrao to support its contention that Alex's skull fracture occurred on November 12th:

Q:      (By Mr. Almaguer) Okay. Doctor, can you tell us whether this fracture [the skull fracture] was a fresh fracture or an old fracture?

A:      It was relatively recent, yes.

Q:      Okay. And what do you mean by recent, Doctor, can you tell us a little bit about the timing of the fracture in relation to the day of the incident, 11/12?

A:      . . . [B]ecause I saw him on the 15th and he presented on the 12th, then that fracture was anywhere between three to seven days old, based on just radiologically, just talking about the fracture by itself without looking at all the other circumstances.

Q:      Now, when you look at all the other circumstances, tell us a little bit about the timing.

A:      This baby received major injuries—his major injuries on the morning of the 12th, November 12th, 2003.

It is clear from our review of the record that appellant has failed to establish the first two prongs of the relevant inquiry: (1) that the newly discovered evidence was unknown or unavailable to appellant at the time of his trial and (2) that appellant's failure to discover or obtain the evidence was not due to a lack of diligence. *See Keeter*, 74 S.W.3d at 36-37. In fact, appellant has merely made bald assertions in his amended motion for new trial that the information was unknown to him prior to trial and that the failure to discover the evidence was not due to a lack of due diligence. We have not found anything in the

24

record supporting appellant's assertions. In any event, Dr. Costa-Luna's affidavits are impeaching of the prior testimony of Dr. Turlipati and Dr. Serrao and the affidavit and investigative reports compiled by Dr. Fernandez. As a result of the impeaching nature of Dr. Costa-Luna's affidavits, we conclude that appellant has failed to establish that this newly discovered evidence would result in a different outcome; thus, appellant would not be entitled to a new trial based on the testimony of Dr. Costa-Luna.

Appellant has also taken issue with the reliability of the jury verdict as it relates to the alleged pressuring of certain jurors to return guilty verdicts. *See* TEX. R. APP. P. 21.3(c). In his original motion for new trial, appellant attached an affidavit from Thelma Quintanilla who alleged that she was pressured to change her vote to guilty and that two other undecided jurors were pressured to change their votes to guilty. Quintanilla further alleged that "I believe that if I had continued with my not guilty verdict, they also would have continued with their undecided verdict."[15] We construe this as a complaint pertaining to juror misconduct.

Rule 21.3(c) provides that:

The defendant must be granted a new trial, or a new trial on punishment, for any of the following reasons:

. . . .

(c) when the verdict has been decided by lot or in any manner other than a fair expression of the juror's opinion;

TEX. R. APP. P. 21.3(c). However, the testimony of jurors is limited by rule 606 of the Texas

---

[15] Quintanilla, in her affidavit, also stated that the jurors voted "'guilty' because of the medical testimony as to the age of the baby's skull fracture and the presence only of Esteban Villegas when the doctors said the fracture to the skull occurred."

25

Rules of Evidence.  *See* TEX. R. EVID. 606(b).  Specifically, rule 606(b) provides:

> **(b) Inquiry Into Validity of Verdict or Indictment.**  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment.  Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes.  However, a juror may testify:  (1) whether any outside influence was improperly brought to bear upon any juror; or (2) to rebut a claim that the juror was not qualified to serve.

*Id.*[16]  To further examine appellant's allegation, we must briefly delve into the history of rule 606 of the rules of evidence.

In 1998, rule 606 of the Texas Rules of Evidence was amended when the civil and criminal rules of evidence were consolidated.  *Glover v. State*, 110 S.W.3d 549, 551 (Tex. App.–Waco 2003, pet. ref'd) (citing *Sanders v. State*, 1 S.W.3d 885, 887 (Tex. App.–Austin

---

[16] Though addressing article 36.22 of the Code of Criminal Procedure, the court of criminal appeals has noted:

> The rule [that a juror cannot impeach his own verdict] is based upon controlling considerations of public policy which in these cases chooses the lesser of two evils.  When the affidavit of a juror, as to the misconduct of himself or the other members of the jury, is made the basis of a motion for a new trial, the court must choose between redressing the injury of the private litigant and inflicting the public injury which would result if jurors were permitted to testify as to what happened in the jury room.
>
> . . . If the facts were as stated in the affidavit, the jury adopted an arbitrary and unjust method in arriving at their verdict, and the defendant ought to have had relief, if the facts could have been proved by witnesses who were competent to testify in a proceeding to set aside the verdict.  But let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict. **If evidence thus secured could be thus used, the result would be to make what was intended to be a private deliberation, the constant subject of public investigation; to the destruction of all frankness and freedom of discussion and conference.**

*State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 202 n.12 (Tex. Crim. App. 2003) (quoting *McDonald v. Pless*, 238 U.S. 264, 266-68 (1915)) (emphasis in original).

1999, no pet.); *see* TEX. R. EVID. 606. The amended version of rule 606 deleted the part of the old criminal rule which allowed jurors to testify about anything relevant to the validity of the verdict or indictment. *Sanders*, 1 S.W.3d at 887; *see* TEX. R. EVID. 606. The purpose of the amended version of rule 606 was to preserve the confidentiality of jury deliberations to ensure that no outside influence and pressure is brought to bear on the jury so that deliberations may be free, independent, and frank.[17] *See State ex rel. Rosenthal v. Poe*, 98 S.W.3d 194, 201-02 (Tex. Crim. App. 2003); *see also* TEX. R. EVID. 606.

Quintanilla's affidavit fails to establish (1) that an outside influence was improperly brought to bear upon any juror or (2) that a juror was not qualified to serve. *See* TEX. R. EVID. 606(b). As such, rule 606(b) of the Texas Rules of Evidence bars Quintanilla from testifying about what happened during jury deliberations. *See id.*[18] We therefore conclude

---

[17] The Texas Supreme Court has also weighed in on juror misconduct stating that public policy demands that jury deliberations be kept private because: "(1) jurors must be encouraged to candidly discuss the case during deliberations; (2) jurors must be protected from post-trial harassment and tampering; (3) disgruntled jurors must be denied an avenue for overturing the verdict; and (4) there is a need for finality in litigation." *Glover v. State*, 110 S.W.3d 549, 551 (Tex. App.–Waco 2003, pet. ref'd) (addressing also rule 606(b)'s companion, rule 327(b) of the Texas Rules of Civil Procedure) (citing *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 367 (Tex. 2000). The supreme court also noted that neither rule 606(b) of the rules of evidence nor rule 327(b) of the rules of civil procedure prohibits a non-juror from testifying about alleged misconduct during deliberations. *See Golden Eagle Archery*, 24 S.W.3d at 369; *see also* TEX. R. EVID. 606(b); TEX. R. CIV. P. 327(b).

[18] Appellant also included an affidavit from Eduardo Perez in his original motion for new trial. Perez alleges in his affidavit that the jury "voted 'guilty' because of the medical testimony as to the age of the baby's skull fracture and the presence only of Esteban Villegas when the doctors said the fracture to the skull occurred." Perez does not make any allegations giving rise to any suspicion of juror misconduct (i.e. being pressured to change a verdict). Appellant alleges that Perez's affidavit demonstrates that the jury erroneously relied on the State's characterization of the facts given that the State allegedly failed to prove identity and its expert witnesses were allegedly unreliable. Appellant therefore asserts that, in light of the statements made by Perez in his affidavit, the jury verdict was unreliable and that he is entitled to a new trial "in the interest of justice." However, it is clear that Perez would be barred from testifying as to what happened during jury deliberations because his affidavit does not establish (1) that an outside influence was improperly brought to bear upon any juror or (2) that a juror was not qualified to serve. *See* TEX. R. EVID. 606(b). The trial court did not abuse its discretion in granting the State's motion to strike Perez's affidavit.

27

that the trial court did not err in granting the State's motion to strike appellant's juror affidavits in support of his amended motion for new trial. Because appellant has not provided testimony from a non-juror to establish the unreliability of the jury's verdict and possible juror misconduct, we further conclude that appellant is not entitled to a new trial "in the interest of justice." Accordingly, we overrule appellant's third issue.

**4. Exculpatory Evidence**

In his fourth issue, appellant contends that the trial court abused its discretion in overruling his motion for new trial on the basis of the State's alleged failure to disclose exculpatory evidence. Specifically, appellant argues that the State "failed to disclose that Mr. Anastasio Farias, the Pro Medic EMS prosecution witness had provided statement [sic] to him that were favorable to the Defendant." Appellant notes that "[t]he jury should have heard from a medical professional that the dad [appellant] was in shock when the medic arrived shortly after the baby's death. The medic could have explained what shock is and the lawyer could have then argued that one in shock could not have killed his own son." The State counters by arguing that such information was fully accessible to appellant from other sources. The State further argues that the trial court implicitly found that the State did not suppress this evidence, the evidence was not favorable to appellant, and the evidence was not material. In addition, the State asserts that Farias' subjective opinions were inadmissible at trial, the same evidence was introduced at trial through Farias and other witnesses, and the alleged withheld evidence is very weak when balanced against the evidence supporting the conviction.

28

### a. Applicable Law

Again, the granting or denying of a motion for new trial lies within the discretion of the trial court. *See Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court's decision was arbitrary or unreasonable. *See id.*

In accordance with the United States Supreme Court's holding in *Brady*, the State is required to provide potentially exculpatory information to the defense. 373 U.S. at 87; *see Thomas v. State*, 841 S.W.2d 399, 402 & n.5 (Tex. Crim. App. 1992); *see also Sierra v. State*, No. 13-05-769-CR, 2007 Tex. App. LEXIS 6303, at **18-20 (Tex. App.–Corpus Christi Aug. 9, 2007, no pet.) (mem. op., not designated for publication). The Due Process Clause of the Fourteenth Amendment of the United States Constitution is violated when the State fails to disclose evidence which is favorable to the accused and that creates a probability sufficient to undermine the confidence in the outcome of the proceedings. *See Thomas*, 841 S.W.2d at 404; *State v. Blanco*, 953 S.W.2d 799, 802 (Tex. App.–Corpus Christi 1997, pet. ref'd) ("A defendant's due process right to a fair trial is violated when the State withholds evidence that is both material and favorable to the accused irrespective of the good faith or bad faith of the prosecution"); *see also* U.S. CONST. amend. XIV. Impeachment evidence, as well as exculpatory evidence, is included within the scope of the *Brady* rule. *See Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (citing *U.S. v. Bagley*, 473 U.S. 667, 676 (1985)). Further, the information must be disclosed to the accused in time to put it to effective use at trial. *See Palmer v. State*, 902 S.W.2d 561, 563 (Tex. App.–Houston [1st Dist.] 1995, no pet.). This includes disclosure of any favorable

29

information in the possession of police agencies or other parts of the "prosecutorial team." *Ex parte Mitchell*, 977 S.W.2d 575, 578 (Tex. Crim. App. 1998) (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)). A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles*, 514 U.S. at 435.

In addition, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002) (quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976)). Rather, the inquiry is whether the failure of the State to disclose the evidence undermines the confidence in the jury's verdict. *See Lempar v. State*, 191 S.W.3d 230, 241 (Tex. App.–San Antonio 2005, pet ref'd) (citing *Ex parte Richardson*, 70 S.W.3d 865, 870 n.22 (Tex. Crim. App. 2002)); *see also Thomas*, 841 S.W.2d at 404 ("The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding, would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.").

**b. Discussion**

Appellant contends that the trial court abused its discretion in denying his motion for new trial based upon his contention that the State failed to disclose exculpatory evidence, specifically the affidavit of Farias, in violation of *Brady*. Appellant attached Farias's affidavit to his amended motion for new trial. The affidavit provides, in relevant part:

> 6. Upon arriving at the scene, I noticed a young man there. He was

30

in total shock. I attended to the baby and he could not answer any of my questions. I later found out that he was the father of the child and that his name was Esteban Villegas.

7. When we transported the child to McAllen Medical Center, Mr. Villegas rode in the ambulance with me. I asked him questions about the child but he would not answer. He continued in total shock as if having been hit with a sledgehammer.

8. I have attended many situations where serious injuries have occurred to people and I have always noticed that the perpetrators are paranoid or very nervous.

9. When I spoke to Mr. Andrew Almaguer about this situation, I told him that it was clear that Esteban Villegas was in total shock and that it was clear he could not have been the perpetrator of this crime. I told the prosecutor that Mr. Villegas' behavior was inconsistent with that of a guilty person.

Appellant contends that Farias's affidavit testimony was both material and favorable to his case.

At the hearing on his motions for new trial, appellant presented testimony from trial counsel, Fernando Mancias, to establish that the State withheld the alleged material and favorable evidence in violation of *Brady*. In his testimony, Mancias noted the following:

Q: Did they follow that in this case?

A: I got a chance to look at the entire file—the entire file that they had on Esteban Villegas. And I saw it two or three different times.

Q: Okay. Did you look for exculpatory evidence?

A: I did.

Q: Did you ask for evidence which might lead to exculpatory evidence?

A: We filed a motion to that effect.

31

. . . .

Q:     All right.  Did Mr. Almaguer [the prosecutor] give you any evidence which he said was exculpatory?

A:     He gave me the entire file.  And he said that's all that we have is the entire file.

Q:     Did he point out any evidence that he said was exculpatory?

A:     No, sir.

Q:     Did anyone else in the prosecutor's office give you any evidence which the person said was exculpatory?

A:     No, sir.

. . . .

Q:     When did you learn of the testimony of Anastacio Farias?

A:     We learned about his testimony more or less about March 7th right before the deadline to file the Motion for New Trial, March 5th and maybe March 7th in that area.

Q:     Of this year?

A:     Of this year.  Yes, sir. 2005.

However, Farias, a designated witness for the State, testified to the following at

trial:

Q:     Do you recall this man right here in the blue?

A:     Yes, sir.

. . . .

Q:     Do you recall how—what was his demeanor like?

32

A: Quiet. I believe he went with us in the ambulance to the hospital. I remember trying to find out a medical history, medication or allergy, and I don't remember receiving an answer for any of those.

. . . .

Q: Was he crying?

A: No, sir.

On cross examination, Farias further testified that:

Q: And you're not saying that Mr. Villegas was unconcerned about his baby's condition, are you?

A: No, sir.

Q: He could have been in shock?

A: He could have been, yes, sir.

It is clear to us that Farias's testimony regarding appellant's demeanor at the scene of Alex's death would probably not undermine the jury's verdict. *See Lempar*, 191 S.W.3d at 241. At best, Farias's affidavit would serve to impeach prior testimony that suggested that appellant's refusal to answer questions about Alex's medical history, allergies, and various other medical issues demonstrated that appellant did not care about the well-being of his child. However, while it is conceivable that Farias's testimony would possibly help the defense, appellant has failed to demonstrate that this testimony would probably lead to a different outcome. *See Wyatt*, 23 S.W.3d at 27. As a result, Farias's affidavit would not be material. *See id.* Moreover, this evidence would not be exculpatory because it does not tend to clear the defendant from alleged fault or guilt. *See Ex parte Mitchell*, 853 S.W.2d 1, 4 (Tex. Crim. App. 1993); *Thomas*, 841 S.W.2d at 404 ("Exculpatory testimony

33

is '[testimony]' or other evidence which tends to justify, excuse or clear the defendant from alleged fault or guilt.'") (quoting BLACK'S LAW DICTIONARY 566 (5th ed. 1990)). The information contained within Farias's affidavit is materially the same as the testimony Farias provided at trial.

Additionally, the record reflects that Farias was made available to appellant for cross-examination at the original trial. In fact, appellant's trial counsel specifically asked Farias about appellant's demeanor at the scene of Alex's death, which makes it clear to this Court that the jury was given an opportunity to consider Farias's contention that appellant was in a state of shock during the trip to the hospital and when the ambulance first arrived. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (noting that the jury, as the trier of fact, is the exclusive judge of the credibility of witnesses and the weight to be afforded their testimony). Therefore, Farias's affidavit would be cumulative of other evidence in the record. *See* TEX. R. EVID. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or *needless presentation of cumulative evidence*.") (emphasis added).[19]

Finally, appellant is required to prove that the evidence allegedly withheld or not disclosed in accordance with *Brady* resulted in harmful error to be entitled to a new trial. *See Harm v. State*, 183 S.W.3d 403, 405 (Tex. Crim. App. 2006); *see also Hampton v. State*, 86 S.W.3d 603, 612 (Tex. Crim. App. 2002); *Wyatt*, 23 S.W.3d at 27. Appellant has

---

[19] The State correctly notes that (1) Dr. Turlipati testified that appellant could have been in shock; Dr. Treviño testified that appellant could have been "stressed out"; and (3) Moya, appellant's wife, testified that appellant was in shock. Therefore, it is clear that the jury was presented with evidence of appellant's shocked nature at the scene of Alex's death.

34

failed to demonstrate that the alleged nondisclosure of Farias's affidavit constituted harmful error, entitling him to relief. *See Marshall v. State*, 210 S.W.3d 618, 636 (Tex. Crim. App. 2006) (holding that the presentation of evidence claimed to be exculpatory can make a *Brady* violation harmless, unless the defendant shows a reasonable probability that an earlier disclosure would have made the outcome of the proceeding different); *see also Lowry v. State*, No. 13-03-00081-CR, 2008 Tex. App. LEXIS 935, at *30 (Tex. App.–Corpus Christi Feb. 7, 2008, no pet. h.).

Based on the foregoing, we conclude that the harm appellant complains of is harmless and did not result in an improper outcome. We therefore further conclude that the trial court did not abuse its discretion in denying appellant's motion for new trial based on his *Brady* contention. Accordingly, we overrule appellant's fourth issue.

## 5. Prosecutor's Comments During Closing Arguments

In his fifth issue, appellant asserts that the prosecutor, in his closing argument, made an inappropriate comment that "the Defense should have exhumed Baby Alex's body." Appellant contends that this comment improperly shifts the burden of proof from the State to the defendant and amounts to reversible error. On the other hand, the State argues that appellant has not preserved this issue for appellate review. The State further argues that the prosecutor's argument was neither "fundamental error" nor improper or harmful because the comment was made in response to appellant's argument that Alex's vitamin C deficiency caused some or all of his injuries.

### a. Applicable Law

An assertion of improper jury argument requires us to review the record in its

entirety to determine whether any erroneous statements were made, and if so, whether they were so prejudicial as to deprive appellant of a fair and impartial trial. *See Willis v. State*, 785 S.W.2d 378, 385 (Tex. Crim. App. 1989); *see also Cavazos v. State*, No. 13-04-00325-CR, 2007 Tex. App. LEXIS 7174, at \*\*23-26 (Tex. App.–Corpus Christi Aug. 30, 2007, pet. ref'd). There are four permissible areas of jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Wilson v. State*, 938 S.W.2d 57, 59 (Tex. Crim. App. 1988); *Chavero v. State*, 36 S.W.3d 688, 699 (Tex. App.–Corpus Christi 2001, no pet.). An argument which exceeds these bounds is error, but only becomes subject to reversal if, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial. *Felder v. State*, 848 S.W.2d 85, 94-95 (Tex. Crim. App. 1992); *Everett v. State*, 707 S.W.2d 638, 640 (Tex. Crim. App. 1986). To determine if the prosecutor made an improper jury argument, the reviewing court must consider the entire argument in context—not merely isolated instances. *See Rodriguez v. State*, 90 S.W.3d 340, 364 (Tex. App.–El Paso 2001, pet. ref'd).

**b. Discussion**

Appellant takes issue with the following exchange:

[MR. ALMAGUER]: As far as infantile scurvy test, they could have done the test. They have that technology nowadays. Well, as they testified, Baby Alex's—we haven't had closure, then why don't they exhume the body? Why don't they do the test? Because we know this is child abuse.

MR. MANCIAS: Judge, I'm going to object to this, Judge. He's trying to

36

> shift the burden of proof from the State where it belongs
> to Esteban Villegas.

THE COURT: Sustained.

To preserve error, a defendant's complaints may take three forms: "(1) a timely, specific objection, (2) a request for an instruction to disregard, and (3) a motion for a mistrial." *Young v. State*, 137 S.W.3d 65, 69 (Tex. Crim. App. 2004). In *Young*, the court of criminal appeals noted:

> Because the objection, the request for an instruction to the jury, and the motion for mistrial seek judicial remedies of decreasing desirability for events of decreasing frequency, the traditional and preferred procedure for a party to voice its complaint has been to seek them in sequence—that is, (1) to object when it is possible, (2) to request an instruction to disregard if the prejudicial event has occurred, and (3) to move for a mistrial if the party thinks an instruction to disregard was not sufficient. However, this sequence is not essential to preserve complaints for appellate review. The essential requirement is a timely, specific request that the trial court refuses.

*Id.* at 69-70 (citations omitted); *see Mathis v. State*, 67 S.W.3d 918, 927 (Tex. Crim. App. 2002); *Holberg v. State*, 38 S.W.3d 137, 141 n.18 (Tex. Crim. App. 2000). As such, we conclude that appellant has preserved this issue for appeal.

The prosecutor's comments appear to be an answer to opposing counsel's argument. Throughout the trial, appellant advanced the theory that Alex died from a vitamin C deficiency. However, it was established that skull fractures are not typically associated with a vitamin C deficiency. Therefore, the timing of Alex's skull fracture was put at issue. Appellant offered expert testimony that suggested that the skull fracture existed prior to the day of Alex's death and provided a whole host of potential causes for the skull fracture, including Moya's theory that the skull fracture was a result of a difficult

child birthing procedure. It was established at trial that a microscopic examination was necessary to date Alex's skull fracture. The record reflected that one microscopic examination had already been done by Dr. Fernandez. However, in order to conduct another microscopic examination in an attempt to refute Dr. Fernandez's findings, Alex's body needed to be exhumed. It is clear that the prosecutor was simply referencing this fact in response to appellant's argument that the skull fracture did not recently occur.[20] Therefore, in reviewing the record in its entirety, we do not find this comment to be manifestly improper.

Moreover, the trial court sustained appellant's objection to the prosecutor's comments pertaining to the exhumation of Alex's body. Though not required to preserve error, it was incumbent on appellant to ask that the jury be instructed to disregard the comments as prejudicial and to seek a mistrial to ensure that the jury did not improperly consider the prosecutor's comments. *Young*, 137 S.W.3d at 69. The record reflects that appellant took neither of these remedial steps. We therefore conclude that the State's closing argument was not "extreme or manifestly improper" and did not constitute reversible error. *See Gaddis v. State,* 753 S.W.2d 396, 398 (Tex. Crim. App. 1988) (noting, "the jury argument must be extreme or manifestly improper, or inject new and harmful facts into evidence to constitute reversible error."). Accordingly, we overrule appellant's fifth issue.

---

[20] "Counsel is allowed wide latitude without limitation in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith." *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

## III. CONCLUSION

Having overruled all of appellant's issues, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX.R.APP.P. 47.2(b)
Memorandum Opinion delivered and
filed this the 13th day of March, 2008.